**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| KIMBERLY G. LAMB, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>MRO CORPORATION, MEDICOPY SERVICES, INC., and DEACONESS HEALTH SYSTEM, INC.,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kimberly G. Lamb ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendants MRO Corporation ("MRO"), MediCopy Services, Inc. ("MediCopy"). and Deaconess Health System, Inc. ("Deaconess") (collectively, "Defendants") and alleges as follows based on personal knowledge as to her own acts and on investigation conducted by counsel as to all other allegations:

## PARTIES

1.    Plaintiff Kimberly G. Lamb is a citizen and resident of Henderson, Kentucky.

2.    Defendant MRO Corporation is a Pennsylvania corporation with its principal place of business located at 1000 Madison Avenue, Suite 100, Norristown, Pennsylvania 19403. Defendant MediCopy is a wholly owned subsidiary of MRO Corporation.

3.    Defendant Deaconess Health System is an Indiana Corporation with its principal place of business located at 600 Mary St, Evansville, Indiana 47747.

## JURISDICTION AND VENUE

1

4.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class members who are diverse from Defendants, and (4) there are more than 100 Class members.

5.      This Court has general personal jurisdiction over Defendants MRO and MediCopy because they maintain principal places of businesses in Pennsylvania and are therefore citizens of the Commonwealth.

6.      This Court has specific personal jurisdiction over Defendant Deaconess because Plaintiff's claims arise out of its contacts with this state.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants MRO and MediCopy are residents of this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

**Background**

8.      Defendant Deaconess is a healthcare provider  providing healthcare services to some 1.5 million patients through twenty-two hospitals located across Illinois, Indiana, and Kentucky.

9.      Defendant MediCopy is a third-party vendor that provides data exchange services for healthcare providers, specializing in handling medical record releases.

10.     Defendant MRO is a clinical data exchange service company that manages clinical data for hospitals and health systems. Defendant MRO purchased MediCopy in 2022, and MediCopy thereafter became a wholly owned subsidiary of MRO with its information, software,

networking, and other technologies, as well as its general business operations, being fully integrated into MRO's systems and operations.[1]

11. As is standard for a healthcare provider, Defendant Deaconess collects, maintains, and stores large volumes of Personal Identifying Information ("PII") and Protected Health Information ("PHI") (collectively, "Private Information") belonging to its current and former patients as part of its general business operations.

12. Deaconess contracts with MediCopy and MRO to handle release of information (ROI) requests on behalf of Deaconess' patients. As part of that business relationship, Deaconess transmitted its patients' Private Information to MediCopy and MRO for storage and handling.

13. Deaconess' patients, such as Plaintiff and Class members, provided their Private Information to Deaconess with the reasonable expectation that Deaconess and its business partners with access to their Private Information, such as MediCopy and MRO, would keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

14. This expectation was objectively reasonable and based on an obligation imposed on all Defendants by statute, regulations, industrial custom, and standards of general due care.

15. Large companies like Defendants have an acute interest in maintaining the confidentiality of the Private Information entrusted to them, and they are well-aware of the numerous data breaches that have occurred throughout the United States and their responsibility for safeguarding Private Information in their possession.

**The Data Breach**

---

[1] Clinical Data Release Leader MRO Announces Acquisition of MediCopy, MRO Corp (Feb. 22, 2022), https://mrocorp.com/news/clinical-data-release-leader-mro-announces-acquisition-of-medicopy/.

16.    On January 13, 2026, unauthorized actors, presumed to be cybercriminals, successfully infiltrated MediCopy/MRO's controlled cloud-based file-sharing software (the "Data Breach"), which was discovered on February 2, 2026.

17.    Deaconess subsequently investigated the Data Breach and determined that its patient information was compromised in the Data Breach, including names, dates of birth, dates of service, medical record numbers, Social Security numbers, health insurance information, and medical records related to the treatment received at Deaconess Health System hospitals.

18.    On and around March 20, 2026, Deaconess began notifying affected patients impacted by the Data Breach.

19.    Plaintiff received a Notice of Data Breach from Deaconess informing her that her Private Information may have been involved in the Data Breach.  A copy of the Notice of Data Breach is attached as Exhibit A.

20.    Defendants have not disclosed details why they were unable to prevent the Data Breach or which security feature failed.

21.    Nor have Defendants explained why they waited more than a month after the Data Breach was discovered to begin notifying affected patients.

22.    Plaintiffs allege that the Data Breach was caused by numerous failures and deficiencies on the part of Defendants, and Deaconess' current and former patients, including Plaintiff and Class members, were damaged as a result.

23.    Plaintiff brings this action on behalf of all those similarly situated to seek relief for, inter alia, the consequences of Defendants' failure to reasonably safeguard their Private Information; their failure to reasonably provide timely notification to Plaintiff and Class members that their Private Information had been compromised; and for Defendants' failure to inform

4

Plaintiff and Class members concerning the status, safety, location, access, and protection of their Private Information.

**Plaintiff's Experience**

24.     Plaintiff is very careful about sharing her sensitive Private Information and diligently maintains her Private Information in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

25.     As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes time spent verifying the legitimacy of communications related to the Data Breach, and self-monitoring her accounts and credit reports to ensure no fraudulent activity has occurred.  Plaintiff estimates that she spends approximately 30 minutes per day taking these precautionary measures as a result of the Data Breach.

26.     Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

27.     After the Data Breach, an unknown actor hacked Plaintiff's Plaintiff has also suffered a substantial increase in phishing emails, spam calls, and spam text messages since the Data Breach, which she reasonably attributes to the Data Breach.

28.     This time has been lost forever and cannot be recaptured. The harm caused to Plaintiff cannot be undone.

29.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and as a result of the Data Breach.

30.     Plaintiff has suffered actual injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of cybercriminals.

31.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

32.     Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendants' control, is protected, and safeguarded from future breaches.

**Injuries to Plaintiff and Class members**

33.     As a direct and proximate result of Defendants' actions and omissions in failing to protect Plaintiff and Class members' Private Information, Plaintiff and Class members have been injured.

34.     Plaintiff and Class members have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

35.     In addition to the irreparable damage that may result from the theft of Private Information, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[2]

---

[2] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

36.    In addition to fraudulent charges and damage to their credit, Plaintiff and Class members may spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; and (j) paying late fees and declined payment penalties as a result of failed automatic payments.

37.    Additionally, Plaintiff and Class members have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their Private Information is used, the diminution in the value or use of their Private Information, and the loss of privacy.

**Securing Private Information and Preventing Breaches**

38.    Defendants could have prevented this Data Breach by properly securing and encrypting the Private Information of Plaintiff and Class members. Alternatively, Defendants could have destroyed the data they no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

39.    Defendants' negligence in safeguarding the Private Information of Plaintiff and Class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

40.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to prevent the Private Information of Plaintiff and Class members from being compromised.

41. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[3] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[4]

42. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class members are long lasting and severe. Once Private Information is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

**The Value of Private Information**

43. It is well known that Private Information, and social security numbers and medical information in particular, is an invaluable commodity and a frequent target of hackers.

44. People place a high value not only on their Private Information, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[5]

45. People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[6] There are long-term consequences to data breach victims whose social

---

[3] 17 C.F.R. § 248.201 (2013).

[4] *Id*.

[5] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*, https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.

[6] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015), https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.

security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiff and Class members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."[7]

46.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices criminals will pay through the dark web. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[8] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[9] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[10]

47.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you

---

[7] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[8] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[9] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[10] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[11]

48.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

49.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[12]

50.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

51.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[13]

---

[11] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[12] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[13] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

52.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

53.     The fraudulent activity resulting from the Data Breach may not come to light for years.

54.     There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

55.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class members, including Social Security numbers, and of the foreseeable consequences that would occur if their data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class members as a result of a breach.

56.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

57.     Defendants knew of the unique type and the significant volume of data contained in the Private Information that Defendants stored on their networks, and, thus, the significant number of individuals who would be harmed by the exposure of the data.

---

[14] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

58.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class members.

**Industry Standards for Data Security**

59.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

60.     In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, and Capital One, Defendants knew of the importance of safeguarding Private Information, as well as of the foreseeable consequences of its systems being breached.

61.     Therefore, the increase in such attacks, and the attendant risk of future attacks, were widely known to the public and to anyone in Defendants' industry, including Defendants.

62.     Security standards commonly accepted among businesses that store Private Information using the internet include, without limitation:

      a.  Maintaining a secure firewall configuration;

      b.  Monitoring for suspicious or irregular traffic to servers;

      c.  Monitoring for suspicious credentials used to access servers;

      d.  Monitoring for suspicious or irregular activity by known users;

      e.  Monitoring for suspicious or unknown users;

      f.  Monitoring for suspicious or irregular server requests;

      g.  Monitoring for server requests for Private Information;

      h.  Monitoring for server requests from VPNs; and

---

[15] *How to Protect Your Networks from Ransomware*, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

i.  Monitoring for server requests from Tor exit nodes.

63.  The FTC publishes guides for businesses for cybersecurity[16] and protection of Private Information[17] which includes basic security standards applicable to all types of businesses.

64.  The FTC recommends that businesses:

a.  Identify all connections to the computers where you store sensitive information.

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

---

[16] Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[17] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

13

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

65.  The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[18]

66.  Because Plaintiff and Class members entrusted Defendants with Private Information, Defendants had a duty to keep the Private Information secure.

67.  Plaintiff and Class members reasonably expect that when their Private Information is provided to a sophisticated business for a specific purpose, that business will safeguard their Private Information and use it only for that purpose.

68.  Nonetheless, Defendants failed to prevent the Data Breach. Had Defendants properly maintained and adequately protected their systems, they could have prevented the Data Breach.

**HIPAA Standards and Violations**

69.  In addition to failing to follow universal data security practices, Defendants failed to follow healthcare industry standard security practices, including:

---

[18] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

    a. Failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. 164.306(a)(2);

    b. Failing to ensure compliance with HIPAA security standards by their workforce or agents in violation of 45 C.F.R 164.306(a)(94);

    c. Failing to effectively train all members of its workforce and its agents on the policies and procedures with respect to PHI as necessary to maintain the security of PHI in violation of C.F.R. 164.530(b) and 45 C.F.R. 164.308(a)(5); and

    d. Failing to design and implement and enforce policies and procedures to establish administrative safeguards to reasonably safeguard PHI in compliance with 45 C.F.R. 164.530(c).

70. Defendant Deaconess' own published privacy policy states that: "We are required by law to maintain the confidentiality of your Protected Health Information (PHI), to give you this Notice describing our practices and legal duties, to follow the terms of the current Notice, and to notify you if your unsecured protected health information has been breached."[19]

71. The notice also states the following:

> **Business Associates**: We may disclose your PHI to contracted parties called Business Associates who assist us by performing services on our behalf. These parties are obligated by law and contract to protect your PHI.[20]

72. Defendant Deaconess failed to live up to its own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate the systems managed by its business associates and steal the Private Information belonging to its patients.

## CLASS ALLEGATIONS

73. This action is brought as a class action pursuant to Fed. R. Civ. P. 23.

---

[19] *Deaconess Joint Notice of Privacy Practices* (updated Feb. 16, 2026), available at
https://www.deaconess.com/getcontentasset/d3f74b91-2674-43c4-a747-7940c1337524/5675f749-da0d-4143-b58b-9f9b6d59d84c/notice-of-privacy-practices-dhs.pdf.
[20] *Id.*

74. The Class is defined as follows:

All persons in the United States whose Private Information was accessed in the Data Breach.

75. The Class excludes the following: Defendants, their affiliates, and their current and former employees, officers and directors, and the Judge assigned to this case.

76. The Class definition may be modified, changed, or expanded based upon discovery and further investigation.

77. *Numerosity*: The Class is so numerous that joinder of all members is impracticable, evidenced by the large number of individuals presently known to have been injured by Defendants' conduct. The Class is ascertainable by records in the possession of Defendants or third parties.

78. *Commonality*: Questions of law or fact common to the Class include, without limitation:

    a. Whether Defendants owed a duty or duties to Plaintiff and Class members to exercise due care in collecting, storing, safeguarding, and obtaining their Private Information;

    b. Whether Defendants breached that duty or those duties;

    c. Whether Defendants failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;

    d. Whether the security provided by Defendants was satisfactory to protect Private Information as compared to industry standards;

    e. Whether Defendants misrepresented or failed to provide adequate information regarding the type of security practices used;

    f. Whether Defendants knew or should have known that they did not employ reasonable measures to keep Plaintiff and Class members' Private Information secure and prevent loss or misuse of that Private Information;

    g. Whether Defendants acted negligently in connection with the monitoring and protecting of Plaintiff and Class members' Private Information;

    h. Whether Defendants' conduct was intentional, willful, or negligent;

        i.     Whether Plaintiff and Class members suffered damages as a result of Defendants' conduct, omissions, or misrepresentations; and

        j.     Whether Plaintiff and Class members are entitled to injunctive, declarative, and monetary relief as a result of Defendants' conduct.

79.    *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

80.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiff's counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

81.    *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no known difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

82. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

83. Defendants' unlawful conduct applies generally to all Class members, thereby making appropriate final equitable relief with respect to the Class as a whole.

84. Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (on behalf of the Class against all Defendants)

85. All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

86. Defendants owed a duty of care to Plaintiff and Class members to use reasonable means to secure and safeguard the entrusted Private Information, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of their systems. These common law duties existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class members would be harmed by the failure to protect their Private Information because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendants knew that it was more likely than not Plaintiff and Class members would be harmed by such exposure of their Private Information.

87. Defendants' duties to use reasonable security measures also arose as a result of the special relationship that existed between Defendants, on the one hand, and Plaintiff and Class members, on the other hand. The special relationship arose because Plaintiff and Class members

entrusted their Private Information with Defendants, Defendants accepted and held the Private Information, and Defendants represented that the Private Information would be kept secure pursuant to their data security policies. Defendants could have ensured that their data security systems and practices were sufficient to prevent or minimize the data breach.

88.     Defendants' duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Private Information. Various FTC publications and data security breach orders further form the basis of Defendants' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

89.     Defendants' violations of Section 5 of the FTC Act constitute negligence per se.

90.     Defendants breached the aforementioned duties when they failed to use security practices that would protect Plaintiff and Class members' Private Information, thus resulting in unauthorized third-party access to the Plaintiff and Class members' Private Information.

91.     Defendants further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit their processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff and Class members' Private Information within their possession, custody, and control.

92.     As a direct and proximate cause of failing to use appropriate security practices, Plaintiff and Class members' Private Information was disseminated and made available to unauthorized third parties.

93.     Defendants admitted that Plaintiff and Class members' Private Information was wrongfully disclosed as a result of the Data Breach.

94.    The Data Breach caused direct and substantial damages to Plaintiff and Class members, as well as the possibility of future and imminent harm through the dissemination of their Private Information and the greatly enhanced risk of credit fraud or identity theft.

95.    By engaging in the forgoing acts and omissions, Defendants committed the common law tort of negligence. For all the reasons stated above, Defendants' conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the Private Information; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff and Class members' Private Information.

96.    But for Defendants' wrongful and negligent breach of the duties owed to Plaintiff and Class members, their Private Information would not have been compromised.

97.    Neither Plaintiff nor the Class contributed to the Data Breach or subsequent misuse of their Private Information as described in this Complaint.

98.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class members have been put at an increased risk of credit fraud or identity theft, and Defendants must mitigate damages by providing adequate credit and identity monitoring services.

99.    Plaintiff and Class members are entitled to damages for the reasonable costs of future credit and identity monitoring services for a reasonable period of time, substantially in excess of one year.

100.    Plaintiff and Class members are entitled to damages to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their Private Information, including the amount of time Plaintiff and Class members have spent and will continue to spend as a result of Defendants' negligence.

101.    Plaintiff and Class members are entitled to damages to the extent their Private Information has been diminished in value because Plaintiff and Class members no longer control their Private Information and to whom it is disseminated.

## COUNT II

### BREACH OF IMPLIED CONTRACT
### (on behalf of the Class against Defendant Deaconess)

102.    Plaintiff hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

103.    Defendant Deaconess ("Defendant" for purposes of this Count) invited Plaintiff and Class members to provide their Private Information to Defendant. As consideration for the benefits Defendant provided, Plaintiff and Class members provided their Private Information to Defendant. When Plaintiff and Class members provided their Private Information to Defendant, they entered into implied contracts by which Defendant agreed to protect their Private Information and only use it solely to provide healthcare services. As part of the offer, Defendant would safeguard the Private Information using reasonable or industry-standard means.

104.    Accordingly, Plaintiff and Class members accepted Defendant's offer to provide healthcare services and provided Defendants their Private Information.

105.    Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant. However, Defendant breached the implied contracts by failing to safeguard Plaintiff's and the Class member's Private Information.

106.    The losses and damages Plaintiff and Class members sustained that are described herein were the direct and proximate result of Defendant's breaches of their implied contracts with Plaintiff and Class members. Additionally, because Plaintiff and Class members continue to be parties to the ongoing contracts, and because damages may not provide a complete remedy for the

21

breaches alleged herein, Plaintiff and Class members are therefore entitled to specific performance of the contracts to ensure data security measures necessary to properly effectuate the contracts maintain the security of their Private Information from unlawful exposure.

107. Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract, and Plaintiff and Class members are entitled to associated damages and specific performance.

<u>**COUNT III**</u>

**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(on behalf of the Class against Defendants MRO and MediCopy)**

108. All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

109. MRO and MediCopy ("Defendants" for purposes of this Count) entered into contracts with its clients, including Deaconess, to provide ROI services.

110. Defendants' services included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was entrusted to it.

111. Such contracts were made expressly for the benefit of Plaintiff and Class members, as it was their Private Information that Defendants agreed to receive, store, utilize, transfer, and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and Class members was the direct and primary objective of the contracting parties and Plaintiff and Class members were direct and express beneficiaries of such contracts.

112. Defendants knew or should have known that if they were to breach these contracts with its customers, Plaintiff and Class members would be harmed.

22

113.    Defendant breached its contracts with customers by, among other things, failing to adequately secure Plaintiff and Class members' Private Information, and, as a result, Plaintiff and Class members were harmed by Defendant's failure to secure its Private Information.

114.    As a direct and proximate result of Defendants' breach, Plaintiff and Class members are at a current and ongoing risk of identity theft, and Plaintiff and Class members sustained incidental and consequential damages including: (i) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (ii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iii) financial "out-of-pocket" costs incurred due to actual identity theft; (iv) loss of time incurred due to actual identity theft; (v) loss of time due to increased spam and targeted marketing emails; (vi) diminution of value of their Private Information; (vii) future costs of identity theft monitoring; (viii) and the continued risk to their Private Information, which remains in Defendant's control, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class members' Private Information.

115.    Plaintiff and Class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

## COUNT IV

**UNJUST ENRICHMENT**
**(on behalf of the Class against all Defendants)**

116.    All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

117.    Plaintiff and Class members have an interest, both equitable and legal, in their Private Information that was conferred upon, collected by, and maintained by Defendants and that was ultimately compromised in the Data Breach.

118. Defendants, by way of their acts and omissions, knowingly and deliberately enriched themselves by saving the costs they reasonably should have expended on security measures to secure Plaintiff and Class members' Private Information.

119. Defendants also understood and appreciated that the Private Information pertaining to Plaintiff and Class members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that Private Information.

120. Instead of providing for a reasonable level of security that would have prevented the Data Breach—as is common practice among companies entrusted with such Private Information—Defendants instead consciously and opportunistically calculated to increase their own profits at the expense of Plaintiff and Class members. Nevertheless, Defendants continued to obtain the benefits conferred on them by Plaintiff and Class members. The benefits conferred upon, received, and enjoyed by Defendants were not conferred gratuitously, and it would be inequitable and unjust for Defendants to retain these benefits.

121. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result. As a result of Defendants' decision to profit rather than provide requisite security, and the resulting breach disclosing Plaintiff and Class members' Private Information, Plaintiff and Class members suffered and continue to suffer considerable injuries in the forms of, *inter alia*, attempted identity theft, time and expenses mitigating harms, diminished value of Private Information, loss of privacy, and increased risk of harm.

122. Thus, Defendants engaged in opportunistic conduct in spite of their duties to Plaintiff and Class members, wherein they profited from interference with Plaintiff and Class members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendants to retain the benefits they derived as a consequence of their conduct.

24

123. Accordingly, Plaintiff and Class members respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically, the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiff and Class members' Private Information, and compensatory damages.

## COUNT V

### BREACH OF FIDUCIARY DUTY
**(on behalf of the Class against Defendant Deaconess)**

124. All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

125. The doctor-patient relationship is a long-established fiduciary relationship, with the physician owing a legal and ethical duty to prioritize his or her patient's wellbeing and interests above their own. Therefore, Deaconess, as a healthcare service provider, owed fiduciary duties to its patients, including Plaintiff and the Class.

126. Furthermore, by the act of collecting and maintaining Private Information belonging to Plaintiff and the Class, Deaconess created a fiduciary relationship between itself and Plaintiff and Class members. As such, Deaconess owed a duty to primarily act for the benefit of its current and former patients upon matters pertaining to this Private Information, including data security.

127. These fiduciary duties and responsibilities are also described under the procedures set forth in the HIPAA Privacy Rule, including the procedures and definitions found in 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which requires Deaconess to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

128.    Plaintiff and Class members provided their Private Information to Deaconess in confidence with the reasonable belief that Deaconess would protect their information. This included the expectation that Deaconess would exercise proper due diligence before transmitting this Private Information to business partners. Plaintiff and Class members would not have provided their information to Deaconess had they known it would fail to adequately protect their information.

129.    Deaconess breached these fiduciary duties by failing to implement adequate safeguards and causing Plaintiff's and Class members' Private Information to be disclosed to unauthorized third parties. Deaconess further breached these fiduciary duties by contracting or otherwise doing business with companies that similarly failed to implement adequate safeguards, and sharing Plaintiff and Class members' Private Information with these entities.

130.    As a direct and proximate result of Deaconess' breaches of its fiduciary duties and the resulting disclosure of Plaintiff and Class member's Private Information, Plaintiff and Class members have suffered damages, including, but not limited to exposure to heightened future risk of identity theft, loss of privacy, confidentiality, and emotional distress, and humiliation.

**COUNT V**

**INVASION OF PRIVACY- INTRUSION UPON SECLUSION AND PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(on behalf of the Class against all Defendants)**

131.    All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

132.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

133.    Plaintiff and the Class successfully took reasonable and appropriate steps to keep their Private Information confidential from the public.

134.    Defendants owed a duty to its patients, including Plaintiff and the Class, to keep this information confidential.

135.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and the Class's Private Information is highly offensive to a reasonable person.

136.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential Private Information to Defendants in order to receive services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

137.    Defendants' conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiff and the Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiff and the Class.

138.    The Data Breach constitutes an intentional interference with Plaintiff and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

139.    Defendants acted knowingly when it permitted the Data Breach because it knew its information security practices were inadequate.

140.    Defendants acted knowingly when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

27

141. By intentionally failing to keep Plaintiff and the Class's Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiff and the Class's privacy by:

    a. Intentionally and substantially intruding into Plaintiff and the Class's private affairs in a manner that identifies Plaintiff and the Class and that would be highly offensive and objectionable to an ordinary person;

    b. Intentionally publicizing private facts about Plaintiff and the Class, which is highly offensive and objectionable to an ordinary person; and

    c. Intentionally causing anguish or suffering to Plaintiff and the Class.

142. As used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id*. cmt. B.

143. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff and the Class's privacy.

144. Acting with knowledge, Defendants had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

145. As a proximate result of Defendants' acts and omissions, Plaintiff and the Class's Private Information were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

146. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their Private Information is still maintained by Defendants with its inadequate cybersecurity system and policies.

147. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard Plaintiff and the Class's Private Information.

148. In addition to injunctive relief, Plaintiff, on behalf of herself and the Class, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment as follows:

a. For an order certifying the Class, appointing Plaintiff as Class Representative, and appointing the law firms representing Plaintiff as counsel for the Class;

b. For compensatory, punitive, statutory, and treble damages in an amount to be determined at trial;

c. Payment of costs and expenses of suit herein incurred;

d. Both pre-and post-judgment interest on any amounts awarded;

e. Payment of reasonable attorneys' fees and expert fees;

f. Such other and further relief as the Court may deem proper.

## JURY DEMAND

Trial by jury is demanded.


Dated: April 2, 2026

Respectfully submitted,

/s/Charles E, Schaffer
Charles E. Schaffer
Nicholas J. Elia
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
cschaffer@lfsblaw.com
nelia@lfsblaw.com

Jeffrey S. Goldenberg *
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Phone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com

Brett R. Cohen*
**LEEDS BROWN LAW, P.C.**
One Old Country Road - Suite 347
Carle Place, New York 11514
Phone: 516-874-4505
bcohen@leedsbrownlaw.com

*Counsel for Plaintiff and Proposed Class*

*\* Pro hac vice forthcoming*